**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

SARAH WILSON,                          :          Case No. 1:17-cv-554
Admin., Estate of Jack Huelsman, *et al.*,
     Plaintiffs,                    :          Judge Timothy S. Black
                         :
vs.                                    :
                         :
ERIC GREGORY, *et al.*,                :
     Defendants.                    :


**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT (Doc. 60), GRANTING PLAINTIFFS'**
**MOTION FOR LEAVE TO FILE SUR-REPLY (DOC. 70),**
**AND TERMINATING THIS CASE IN THIS COURT**

This civil action is before the Court on the motion for summary judgment of

Defendants Eric Gregory, Meredith Walsh, and Clermont County Board of

Commissioners and Sheriff Robert Leahy ("County Defendants") (Doc. 60) and the

parties' responsive memoranda (Docs. 66, 69, 70-1).  Also before the Court is the motion

of Plaintiffs for leave to file sur-reply or in the alternative, to strike arguments raised for

the first time in Defendants' reply to Plaintiffs' memorandum in opposition, and a

renewed request for oral argument (Doc. 70) and Defendants' memorandum in opposition

(Doc. 71).[1]

---

[1] Plaintiffs seek oral argument on these motions. (Docs. 66, 70).  S.D. Ohio Civ. R. 7.1(b)(2) provides for oral argument where it "is deemed to be essential to the fair resolution of the case because of its public importance or the complexity of the factual or legal issues presented [.]" Here, the Court finds that the factual and legal issues are clear on their face, so oral argument is not necessary.  *See Whitescarver v. Sabin Robbins Paper Co.,* Case No. C–1–03–911, 2006 WL 2128929, at *2, (S.D. Ohio July 27, 2006) (C.J. Dlott) ("Local Rule 7.1(b)(2) leaves the Court with discretion whether to grant a request for oral argument.").

## I.     BACKGROUND[2]

### A. Undisputed Facts

This case centers around the tragic events that occurred on September 19, 2015. At 12:06 p.m. that day, Plaintiff Sarah Wilson called 911 to report that her father, Jack Huelsman, was having a "psychiatric emergency" and that he was mentally ill, bi-polar, and had been on a downward mental decline. (Docs. 60-1 at ¶ 1, 40-1, 50-12). Wilson also reported to the 911 dispatcher that Mr. Huelsman was possibly thinking of committing suicide. (Docs. 40-1, 50-12). Wilson also stated that there were guns in the house and she did not know whether Mr. Huelsman had access to them. (*Id.*) Wilson was not at her parent's residence with her father when she called 911. Wilson called 911 after having a phone conversation with her mother, Cheryl Huelsman, who was with Mr. Huelsman. (Doc. 60-1 at ¶¶ 2–3). In her deposition, Mrs. Huelsman said she did not want to call 911 in front of Mr. Huelsman so as not to escalate the situation. (Doc. 39 at PAGEID# 224).

At 12:08 p.m., Deputy Eric Gregory of the Clermont County Sheriff's Office ("CCSO") and an emergency medical service unit ("EMS") were dispatched to the Huelsman residence. (Doc. 60-1 at ¶ 4). Dispatch informed Deputy Gregory that the call

---

[2] Pursuant to the Standing Order of the Court, Defendants filed a Statement of Proposed Undisputed Facts. (Doc. 60-1). Plaintiffs responded to Defendants' Proposed Undisputed Facts and filed their own Statement of Disputed Issues of Material Fact. (Doc. 68-1). The Court's statement of facts set forth here incorporates the facts undisputed by the parties and the facts confirmed by the Court upon review of the citations to the evidentiary record provided by the parties.

was for a "64-year old male hearing voices." (*Id.*)[3]  Dispatch also clarified that there had

been no prior calls to 911 for emotional or mental health issues from the residence. (*Id.*

at ¶¶ 5–6).  CCSO Deputy Meredith Walsh was also dispatched to the residence. (*Id.* at

¶ 7).  EMS was dispatched for a patient with abnormal behavior and was directed to stage

near the residence. (*Id.* at ¶ 8).

Upon arrival at the Huelsman residence, Deputy Gregory knocked on the door and

Mrs. Huelsman invited him in. (*Id.* at ¶ 12).  When Deputy Gregory entered, Mrs.

Huelsman was crying, and Mr. Huelsman was calm. (*Id.* at ¶ 13).[4]  Mrs. Huelsman

advised Deputy Gregory of the situation and told him that Mr. Huelsman was hearing

voices and was paranoid. (*Id.* at ¶ 14).  Deputy Gregory then messaged dispatch to direct

the EMS unit to stand down.[5] (*Id.* at ¶ 15).

After Mrs. Huelsman told Deputy Gregory that Mr. Huelsman was hearing voices,

Mr. Huelsman explained that he wasn't hearing voices.  Mr. Huelsman said he heard

someone talking about politics and didn't know where it was coming from, but realized

that the radio was on. (*Id.* at ¶¶ 16-17).  Mrs. Huelsman also said that Mr. Huelsman was

---

[3] The parties dispute whether Deputy Gregory had been told that Mr. Huelsman was suicidal.
(Docs. 60-1 at ¶ 11, 68-1 at ¶ 11).

[4] The parties dispute the mental and emotional state of the Huelsmans.  Defendants claim Mrs.
Huelsman was crying, and Mr. Huelsman was calm and composed. (Doc. 60-1 at ¶ 13).
Plaintiffs claim Mrs. Huelsman was crying and calm, and Mr. Huelsman was calm, but not
composed. (Doc. 68-1 at ¶ 13).

[5] The parties dispute the reason Deputy Gregory directed the EMS unit to stand down.
Defendants assert Deputy Gregory told them to stand down because there was no physical injury
that required EMS attention. (Doc. 60-1 at ¶ 15).  Plaintiffs deny this assertion. (Doc. 68-1 at
¶ 15).

paranoid because he believed she caused his phone to stop working.  (*Id.* at ¶ 18).  Mr. Huelsman informed Deputy Gregory that his electronics were not working properly.  Mrs. Huelsman never checked to see if the electronics were actually working.  (*Id.* at ¶ 19).

Mr. Huelsman told Deputy Gregory that his wife had taken all the guns in the house and that they were locked up and Mrs. Huelsman had taken the keys.  (*Id.* at ¶ 20).  Deputy Gregory separated the Huelsmans, directing Mrs. Huelsman outside.  (*Id.* at ¶ 22).  Mrs. Huelsman became increasingly emotional outside.  (*Id.* at ¶ 23).  Mrs. Huelsman told Deputy Gregory that she thought her husband needed to go to the hospital.  (*Id.* at ¶ 24).  Deputy Gregory told Mrs. Huelsman that he did not believe that he had enough probable cause to remove Mr. Huelsman from his residence and transport him to the hospital.  (*Id.* at ¶ 25).

Mrs. Huelsman then said she was afraid of her husband and afraid that he may be suicidal.  (*Id.* at ¶ 26).  Deputy Gregory testified that Mr. Huelsman, having heard Mrs. Huelsman's statement to Deputy Gregory, responded that he was not suicidal and that the only statement he made regarding suicide was that if he ever killed himself, she wouldn't be able to afford their house.  (*Id.* at ¶¶ 27, 31; Doc. 50 at PAGEID# 1397).[6]

Deputy Walsh arrived at the Huelsman residence while Deputy Gregory was

---

[6] The parties dispute whether Deputy Gregory perceived this statement by Mr. Huelsman as a threat or intention to commit suicide.  (Docs. 60-1 at ¶ 28, 68-1 at ¶ 28).  The parties dispute whether Mr. Huelsman denied being suicidal or making any suicidal threats, whether Mr. Huelsman was calm and composed, and whether Mrs. Huelsman was not calm and half-hysterical.  (Docs. 60-1 at ¶¶ 32–34, 68-1 at ¶¶ 32–34).

outside talking with Mrs. Huelsman.  (Doc. 60-1 at ¶ 29).  Deputy Walsh then spoke with Mrs. Huelsman outside while Deputy Gregory went back in the house to speak to Mr. Huelsman.  (*Id.* at ¶ 30).  Although the parties dispute the emotional state of Mrs. Huelsman and why she was emotional, the parties agree that Mrs. Huelsman became increasingly emotional when she was outside the house.  (*Id.* at ¶ 48).  Although very emotional, Mrs. Huelsman never asked to go back inside the house to be with her husband at any time prior to his death.  (*Id.* at ¶ 54).  Deputies Walsh and Gregory discussed the conversations they had with each spouse and determined that neither of the spouses provided any information to give them probable cause to transport Mr. Huelsman to the hospital.  (*Id.* at ¶ 35).

Subsequently, Deputy Walsh left the Huelsman residence to respond to a non-breather.  (*Id.* at ¶ 36).[7]  Deputy Gregory went to his car to contact his supervisor, Corporal Buelterman, and moved his car up the driveway.  (*Id.* at ¶ 37).  Deputy Gregory then contacted Mobile Crisis and requested to have someone respond to the Huelsman residence.  (*Id.* at ¶ 38).  Will Cates, the mobile crisis team responder, called Deputy Gregory to tell him he was on his way to the Huelsman residence.  (*Id.* at ¶ 39).  Mrs. Huelsman then went into the barn on the property.  (*Id.* at ¶ 40).

With Mrs. Huelsman in the barn and Deputy Gregory in his car, Mr. Huelsman shot himself.  (*Id.* at ¶¶ 40–41).  Deputy Gregory went into the house and found Mr.

---

[7] The parties dispute whether Deputy Walsh herself needed to respond to the non-breather or if someone else could have taken the call and Deputy Walsh could have remained at the Huelsman residence.  (Docs. 60-1 at ¶ 36, 68-1 at ¶ 36).

Huelsman deceased from a gunshot wound. (*Id.* at ¶ 42). Deputy Gregory then contacted dispatch and his supervisor. (*Id.* at ¶ 43).

Corporal Brett Buelterman, Deputy Walsh, Deputy Sean Schubert, Sergeant Greg Moran, and Investigator Christopher Allen responded to the scene at the Huelsman residence. (*Id.* at ¶ 44). Scott Arthur and Joseph Martin, two EMS technicians, Deputy Schubert, and Corporal Buelterman entered the barn where Mrs. Huelsman was located. Corporal Buelterman and Deputy Schubert informed Mrs. Huelsman that her husband had shot himself, and she understandably became distraught. (Doc. 68-1 at ¶ 48).

Mr. Cates then signed an application for emergency admission for Mrs. Huelsman to be taken to the hospital for a 72-hour hold. (Doc. 60-1 at ¶ 49). Corporal Buelterman transported Mrs. Huelsman to the hospital in his patrol vehicle. (*Id.* at ¶ 50).

Sheriff Leahy asked Sergeant Sellars to conduct an administrative inquiry to determine if officer failure was an issue in this situation. (*Id.* at ¶ 62). Sergeant Sellers determined that no internal investigation needed to be done and that the deputies had followed all policies and that there was no misconduct. (*Id.* at ¶ 63, Sellars Dep. Doc. 46 at PAGEID# 732).

### B. Plaintiffs' Proposed Disputed Facts

Accompanying their response to Defendants' Statement of Proposed Undisputed facts, Plaintiffs offer thirteen disputed issues of fact that the Plaintiffs contend are "material" and need to be resolved upon trial. (Doc. 68-1 at 10–18). Plaintiffs contend that the following facts are in dispute:

1. Whether Mrs. Huelsman's mental status did not allow her to call 911.
   Plaintiffs contend Mrs. Wilson called 911 because Mrs. Huelsman did not want
   to further anger Mr. Huelsman, not because of Mrs. Huelsman's mental state.
   (*Id.* at ¶ 1.)

2. Whether the EMS unit dispatched to the Huelsman residence was limited to
   only patient medical evaluations, or whether they could assess an individual's
   mental health.  Plaintiffs contend that the EMS workers were trained to provide
   mental health assessments.  (*Id.* at ¶ 2.)

3. Whether Deputies Gregory and Walsh knew from dispatch that the call to the
   Huelsman residence involved potential suicide.  Plaintiffs contend that
   Deputies Gregory and Walsh were aware that the 911 call pertained to a
   possible suicide.  (*Id.* at ¶ 3).

4. Whether Mr. Huelsman was calm, composed, and rational during his encounter
   with the deputies.  Plaintiffs contend that Mr. Huelsman became upset, visibly
   agitated, and tried not to yell once Deputy Gregory arrived.  (*Id.* at ¶ 4).

5. Whether Mobile Crisis was called for Mr. Huelsman or Mrs. Huelsman.
   Plaintiffs contend that Deputy Gregory called in regard to Mr. Huelsman's
   suicidality and that Mrs. Huelsman was an ancillary request.  (*Id.* at ¶ 5).
   Plaintiffs also contend that Mrs. Huelsman was not inconsolable until she
   learned Mr. Huelsman had killed himself.  (*Id.* at ¶ 5(a)).

6. Whether Mrs. Huelsman would have been permitted to go back inside the

house if she requested to.  Plaintiffs contend Mrs. Huelsman was clearly not permitted to go back inside the house.  (*Id.* at ¶ 6).

7. Whether Deputies Gregory and Walsh knew Mr. Huelsman was at risk for suicide.  Plaintiffs contend that the deputies knew that Mr. Huelsman was suicidal, had a history of mental illness, was under the care of a psychiatrist, had access to a gun,[8] was violent, was thinking of committing suicide, and that Mrs. Huelsman was afraid for him to be left alone because he was suicidal. (*Id.* at ¶ 7).

8. Whether Deputies Gregory and Walsh took affirmative actions that increased Mr. Huelsman's risk of suicide.  (*Id.* at ¶ 8).

9. Whether Deputies Gregory and Walsh knew Mr. Huelsman had access to weapons.  Plaintiffs contend that the deputies were informed that Mr. Huelsman had access to weapons, specifically a gun.  (*Id.* at ¶ 9).

10. Whether Mr. Huelsman was safer before Deputies Gregory and Walsh separated him from his wife.  Plaintiffs note that their CIT expert opined that Mr. Huelsman was safer before Deputies Gregory and Walsh separated him from his wife.  (*Id.* at ¶ 10).

---

[8] Notably, Plaintiffs do not dispute that Mr. Huelsman told Deputy Gregory that Mrs. Huelsman had locked up all of the guns in the household and taken away the key.  Plaintiffs do not contend that Mrs. Huelsman informed the deputies that Mr. Huelsman still had access to a gun.  (*See* Docs. 60-1 at ¶ 20, 68-1 at ¶ 20).  Plaintiffs suggest that Mrs. Huelsman "did not confirm that every single gun in the house was locked up and inaccessible to Mr. Huelsman."  (Doc. 68-1 at 16 ¶ 11).

11. Whether Deputies Gregory and Walsh were deliberately indifferent and whether their affirmative actions were reckless.  (*Id.* at ¶ 11).

12. Whether Sheriff Leahy conducted a meaningful investigation of the Defendants' actions.  Plaintiffs contend that Captain Sellars' administrative inquiry was not an investigation and that the only investigation was a "death investigation."  (*Id.* at ¶ 12).

13. Whether Defendants denied Mr. Huelsman a reasonable accommodation in violation of the Americans with Disabilities Act ("ADA").  (*Id.* at ¶ 13).

## C.  Procedural Posture

Plaintiffs filed this lawsuit on August 22, 2017.  (Doc. 1).  Plaintiffs bring five causes of action: (i) a 42 U.S.C. § 1983 claim for relief alleging violations of the Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure and the right to receive due process under law against all Defendants (*id.* at ¶ 51), (ii) wrongful death against Deputies Gregory and Walsh (*id.* at ¶¶ 52–53), (iii) intentional infliction of serious emotion distress against Deputies Gregory and Walsh (*id.* at ¶ 54), (iv) violation of the ADA against the County Defendants (*id.* at ¶¶ 55–58), and (v) negligent infliction of emotional distress against Deputies Gregory and Walsh (*id.* at ¶¶ 59–60).

On March 18, 2019, Defendants filed the motion for summary judgment, seeking dismissal of all of Plaintiffs' claims.  (Doc. 60).  The motion for summary judgment has been fully briefed, and Plaintiff's motion for leave to file a surreply (Doc. 20) is also fully

briefed.  The Court will analyze that motion first before turning to the motion for summary judgment.

## II.    MOTION FOR LEAVE TO FILE SUR-REPLY

The Local Civil Rules permit the filing of a motion and memorandum in support, a memorandum in opposition, and a reply memorandum. S.D. Ohio Civ. R. 7.2(a)(1), (2). "No additional memoranda beyond those enumerated will be permitted except upon leave of court for good cause shown."  S.D. Ohio Civ. R. 7.2(a)(2).  Generally, "good cause" exists where the reply brief raises new grounds that were not included in movant's initial motion.  *NCMIC Insurance Co. v. Smith*, 375 F. Supp. 3d 831, 836 (S.D. Ohio 2019); *see also Seay v. Tennessee Valley Authority*, 339 F.3d 454, 481 (6th Cir. 2003) (generally a court will grant leave to file a sur-reply "[w]hen new submissions and/or arguments are included in a reply brief, and a non-movant's ability to respond to the new evidence has been vitiated.").

Here, Plaintiffs argue that there are four instances where Defendants have raised new arguments or evidence in the reply brief: (1) that Defendants are entitled to state law immunity because their actions were not reckless (Doc. 69 at 3); (2) that a reasonable accommodation (related to Plaintiffs' ADA claim) did not exist "because Deputy Gregory didn't have the power or authority to require EMTS to act" as "the EMTS are a completely different agency not under control of the Sherriff" (*Id.* at 4); (3) that the Court should analyze this case, not with other suicide cases, but rather should simply analyze whether the "contours of the law regarding state created danger as it pertains to officers

10

responding to 911 calls where an individual ultimately takes their own life" was clearly established (*Id.* at 5); and (4) that Defendant officers did not believe Mr. Huelsman to be suicidal as Mrs. Huelsman herself "never actually told the Deputies that her husband was suicidal." (*Id.*).

The Court is unpersuaded that any of these instances are in fact "new arguments." Instead, each of these "new arguments" made by Defendants were either made in the Defendants' initial brief or were made in response to arguments made in Plaintiffs' brief in opposition to summary judgment. The Court finds that there is not good cause justifying a sur-reply.

Nevertheless, "in this circuit, there is 'a strong preference that claims be adjudicated on the merits.'" *National City Bank v. Aronson*, 474 F. Supp. 2d 925, 930 (S.D. Ohio 2007) (citing *Coleman v. Shoney's, Inc.*, 79 F. App'x 155, 157 (6th Cir. 2003)). Courts in this district have "granted to leave file sur-reply in the absence of good cause where the non-moving party 'will suffer no prejudice by the filing of the sur-reply.'" *NCMIC*, 375 F. Supp. 3d at 836 (citing *National City Bank*, 474 F. Supp. 2d at 930); *see also Burt v. Life Insurance Co. of North America*, 2006 WL 4633539, at *3 (S.D. Ohio Aug. 7, 2006) (permitting a sur-reply without good cause shown where "allowing Defendant to file its Sur-Reply results in no prejudice toward Plaintiff").

Here, permitting Plaintiffs' surreply will not prejudice Defendants as it ultimately has no effect on the outcome of Defendants' motion for summary judgment. Accordingly, Plaintiffs' motion for leave to file sur-reply (Doc. 70) is **GRANTED** and

the Court will consider Plaintiffs' sur-reply.  (Doc. 70-1).

### III.    MOTION FOR SUMMARY JUDGMENT

#### A.  Standard of Review

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248.

#### B.  Analysis

Here, Defendants argue that all of Plaintiffs' claims fail as a matter of law.  First, Defendants contend that Deputies Gregory and Walsh are entitled to qualified immunity on Plaintiffs' constitutional claims.  (Doc. 60 at 7–9).  Second, Defendants argue that County Defendants are not liable under § 1983 because there is no underlying constitutional violation.  Third, Defendants argue that Deputies Gregory and Walsh did

not intentionally discriminate against Mr. Huelsman or fail to provide a reasonable accommodation in violation of the ADA. Fourth, Defendants argue that Deputies Gregory and Walsh are entitled to statutory immunity for the state law claims pursuant to Ohio Revised Code § 2744.02 *et seq*. Fifth, Defendants contend that—even if Deputies Gregory and Walsh are not entitled to statutory immunity for the state law claims—they are not liable under the state law claims. The Court will address each argument in turn.

### 1. Deputies Gregory and Walsh are entitled to qualified immunity

Defendants argue that Deputies Gregory and Walsh are entitled to qualified immunity for Plaintiffs' claims brought under § 1983.

Qualified immunity protects officers from liability for mistakes of law and fact. *Chappell v. City of Cleveland*, 585 F.3d 901, 916 (6th Cir. 2009). The defense of qualified immunity completely protects government officials performing discretionary functions from § 1983 actions unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982). A right is "clearly established if [a] reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Therefore, Deputies Gregory and Walsh are entitled to qualified immunity if reasonable officers would have believed that their conduct was lawful, "in light of clearly established law and the information [Deputies Gregory and Walsh] possessed." *Bell v. City of East Cleveland*, 1997 WL 640116, at *2 (6th Cir. 1997) (citing *Creighton*, 483 U.S. at 641).

Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful.  *Bell*, 1997 WL 640116, at *3 (citing *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002)).  Qualified immunity "gives ample room for mistaken judgments by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'"  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  *Id.* at 526.  As a result, the court must resolve qualified immunity questions at the earliest possible stage in litigation.  *Hunter*, 502 U.S. at 227.

Plaintiffs bear the burden of showing that defendants are not entitled to qualified immunity.  *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005).  There is generally a two-step analysis to determine whether a police officer is entitled to qualified immunity.  *Thacker v. Lawrence County*, 182 F. App'x 464, 468–69 (6th Cir. 2006) (citing *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310–11 (6th Cir. 2005)).  The first step asks whether the police officer violated a constitutional right.  *Bell*, 1997 WL 640116, at *3.  The second step determines whether the right was clearly established in a "particularized sense," such that a reasonable officer confronted with the same situation would have known that their actions violate that right.  *Id.*  The court has discretion to

decide which of the two elements to address first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

The Court will first analyze whether Deputies Gregory and Walsh violated a constitutional right of Mr. Huelsman.

### a. Deputies Gregory and Walsh did not violate Mr. Huelsman's Constitutional Rights

To adequately allege a § 1983 claim, Plaintiffs must plead facts that show the deprivation of a constitutional right caused by someone acting under color of state law. *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 463 (6th Cir. 2006). Generally, "a State's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). However, Courts recognize exceptions to this rule including the "state-created danger" exception, the "special relationship" exception, or the "shocks the conscience" exception. Here, Plaintiffs claim that Deputies Gregory and Walsh violated Mr. Huelsman's Fourteenth Amendment substantive due process right by "taking affirmative actions that increased the danger to Mr. Huelsman that he would commit suicide." (Doc. 66 at 19). Thus, Plaintiffs claim that the "state-created danger" exception applies.

As an initial matter, it is important to examine the Sixth Circuit state-created danger jurisprudence in instances of suicide. Defendants note that the Sixth Circuit has never imposed liability on state officials in situations involving suicides. (Doc. 69 at 8). In *Cutlip v. City of Toledo*, the Sixth Circuit explained why the state-created danger

15

theory is generally inapplicable in cases involving suicide:

> The rarity of *DeShaney* liability for suicides can be partially attributed to the high standard of proof in state-created-danger cases, but it is also uniquely difficult to assign constitutional liability to the government when the non-custodial victim harms himself. As a general principle, people cannot violate their own constitutional rights, and where a person makes a free and affirmative choice to end his life, the responsibility for his actions remains with him. That a state official somehow contributed to a person's decision to commit suicide does not transform the victim into the state's agent of his own destruction.

488 F. App'x 107, 116 (6th Cir. 2012) (citing *Jones v. Reynolds*, 438 F.3d 685, 694 (6th Cir. 2006) (holding that where a person "bears some responsibility for the risks she has incurred, it is even more difficult to say that the 'state' has 'created' the 'danger' to her by its affirmative acts")).

In *Jahn v. Farnsworth*, the Sixth Circuit reemphasized its finding in *Cutlip*:

> When this Court confronted the application of the state-created-danger doctrine in instances of suicide in *Cutlip*, we noted that the Circuit "has never found liability under the state-created-danger doctrine where the victim committed suicide." We reiterate here that this is due in part to the high standard of proof in state-related danger cases, but also because "people cannot violate their own constitutional rights, and where a person makes a free and affirmative choice to end his life, the responsibility for his actions remains with him."

617 F. App'x 453, 463 (6th Cir. 2015) (quoting *Cutlip*, 488 F. App'x at 116) (internal citation omitted).

Plaintiffs point to two recent cases from this district—including one by this Court—that permitted state-created danger claims to proceed even where an individual committed suicide. *See Estate of Olsen v. Fairfield City School Dist. Bd. of Education*, 341 F. Supp. 3d 793, 803 (S.D. Ohio 2018) (J. Barrett); *Meyers v. Cincinnati Bd. of*

*Education*, 343 F. Supp. 3d 714, 725 (S.D. Ohio 2018) (J. Black).  Those two cases are clearly distinguishable from the matter at hand.

To name a few distinctions, first, *Olsen* and *Meyers* were at the motion to dismiss stage, so all well-pleaded factual allegations were taken as true.  Second, neither case involved qualified immunity.  Third, both *Olsen* and *Meyers* involved school officials taking actions that increased students' risk of committing suicide due to bullying.  The state-created danger case law is different in actions involving police responding to 911 calls involving suicide, and school bullying that leads to suicide.  That is largely because both *Olsen* and *Meyers* relied on Sixth Circuit opinion that came after both *Cutlip* and *Jahn* that found "[i]f a school is aware of a student being bullied but does nothing to prevent the bullying, it is reasonably foreseeable that the victim of the bullying might resort to self-harm, even suicide."  *Tumminello v. Father Ryan High School, Inc.*, 678 F. App'x 281, 288 (6th Cir. 2017).  Fourth, in both *Olsen* and *Meyers*, the bullied students only became suicidal after the defendants committed the affirmative acts at issue.  In this case, Mr. Huelsman was suicidal before Deputies Gregory and Walsh arrived at the Huelsman residence.  Therefore, the two cases identified by Plaintiffs are clearly distinguishable from the Sixth Circuit opinions finding that, generally, situations where a victim commits suicide are incongruous with a state-created danger theory.

Nevertheless, the Court will now analyze whether the Plaintiffs have adequately stated a state-created danger claims against Deputies Gregory and Walsh.  In order to succeed on a state-created danger claim, Plaintiffs must show:

(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (quoting *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)).

### i. Affirmative Act

To satisfy the affirmative-act element of a state-created danger claim, "a plaintiff must point to conduct that either created or increased a risk of harm and demonstrate that not only could the state actor have saved him from that harm but also that the plaintiff was safer before the state action than he was after it." *M.F. v. Perry Cty. Children & Family Servs.*, 2017 WL 6508573, at *5 (S.D. Ohio Sept. 13, 2017), *aff'd*, 725 F. App'x 400 (6th Cir. 2018) (quoting *Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017)) (internal quotation marks omitted).

Plaintiffs identify the following affirmative actions committed by Deputies Gregory and Walsh: keeping Mr. Huelsman in his home, removing his wife from the home, leaving the home, calling off the EMS unit, and removing all supervision over Mr. Huelsman. (Doc. 1 at ¶ 38). While it is disputed whether Deputies Gregory and Walsh were aware that Mr. Huelsman was suicidal before they arrived at the Huelsman residence, the evidence shows that the danger of Mr. Huelsman committing suicide existed before the conduct at issue. The issue, therefore, is whether the actions identified by Plaintiffs increased the risk of Mr. Huelsman committing suicide.

The Court finds, keeping in mind the high standard of proof required for state-created danger claims, that there is not sufficient evidence that Deputies Gregory's and Walsh's conduct constitutes an affirmative act that increased the risk of Mr. Huelsman committing suicide.

Although not completely analogous, the case most instructive is the Sixth Circuit's decision in *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460 (6th Cir. 2006). In *McQueen*, the Sixth Circuit held that a teacher did not commit an affirmative act that increased the risk of a student shooting another student when she left the classroom unattended. There, the court concluded that the danger to the victim was the other student's possession of the gun and the victim's presence in the room. *Id.* at 465–66. The Sixth Circuit affirmed the district court's conclusion that the plaintiff's contention that the shooter would not have been able to fire the gun if the teacher had been in the room was mere "hindsight deduction." *Id.* at 465 (quoting the district court decision). The court further found that had the teacher been in the room, there was no guarantee that the teacher would have been able to prevent the shooting. *Id.* at 466.

Here, because Mr. Huelsman was suicidal and had access to a gun[9] before

---

[9] As discussed *infra*, while Plaintiffs contend it is in dispute whether Deputies Gregory and Walsh were aware Mr. Huelsman had access to a gun. It is undisputed, however, that Mr. Huelsman told Deputy Gregory that Mrs. Huelsman had locked away all of his guns, and that Mrs. Huelsman never told the deputies that he had access to a gun. (*See* Docs. 60-1 at ¶ 20, 68-1 at ¶ 20).

Moreover, Plaintiffs fail to make any showing that the actions of Deputies Gregory or Walsh increased Mr. Huelsman's access to a gun, as there is no evidence relating to when, where, or how Mr. Huelsman accessed the gun.

Deputies Gregory and Walsh arrived, the Court cannot conclude that the alleged affirmative actions increased the risk of Mr. Huelsman committing suicide.  As in *McQueen*, had Deputies Gregory and Walsh not separated Mr. and Mrs. Huelsman, not called off the EMS unit, or not left Mr. Huelsman unsupervised there is no guarantee that they would have been able to prevent Mr. Huelsman from shooting himself.  *See Shaw v. City of Dayton, Ohio*, 183 F. Supp. 3d 876, 887–88 (S.D. Ohio 2016), *aff'd sub nom. RACHEL SHAW v. CITY OF DAYTON, ET AL* (6th Cir. June 2, 2016) (granting defendant's motion for summary judgment on state-created danger claim in finding that police officer did not increase an individual's risk of suicide because the individual "committed an act of violence on himself.  [The individual] could have accomplished the same end, although perhaps by different means" if the officer had conducted a different act).  To speculate otherwise would be inappropriate second-guessing with hindsight bias.  Indeed, in her deposition, Mrs. Huelsman stated that she though it was a good thing when Deputy Gregory told her to go outside because "I was thinking that he was trying to diffuse the situation by not talking about [Mr. Huelsman] right in front of him."  (Doc. 39 at PAGEID# 238).  Moreover, as Mrs. Huelsman specifically told Deputy Gregory that she was afraid of Mr. Huelsman (Doc. 60-1 at ¶ 26), the deputies' actions may have prevented additional injuries.

While the Court does not find that there is no scenario where the affirmative actions of a police officer could create or increase the risk of an individual committing suicide, this is not that case.  Thus, the Court comes to the same conclusion as the Sixth

Circuit in *Cutlip* and *Jahn*: Plaintiffs have not met the high standard of proof required to prove a state-created danger claim as they have failed to show that Deputies Gregory and Walsh created or increased the danger of Mr. Huelsman committing suicide. *Cutlip*, 488 F. App'x at 116; *Jahn*, 617 F. App'x at 463.

### ii. Mental State

Although the Court finds that Plaintiffs have not satisfied the first element of the state-created danger test, even if they had, they fail to demonstrate that Deputies Gregory and Walsh had the required mental state to satisfy the third element of a state-created danger claim.[10]

The mental state required to satisfy the third prong of the state-created danger test amounts to deliberate indifference, which the Sixth Circuit has "equated . . . with subjective recklessness." *McQueen*, 433 F.3d at 469. In order to show subjective recklessness, the state official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "The government's conduct must be so egregious that it can be said to be arbitrary in the constitutional sense, but the standard is no calibrated yard stick." *Id.* (quoting *Ewolski*, 287 F.3d at 510) (internal quotation marks omitted). Subjective recklessness can be "proven circumstantially by evidence showing that the risk was so obvious that the official had to have known about it." *Bukowski v. City of Akron*, 326

---

[10] Defendants only briefly dispute that Plaintiffs fail to satisfy the second element of the state-created danger test. (*See* Doc. 60 at 22–23). Here, the Court finds that it is clear that the second prong of the state-created danger test is satisfied as the alleged danger is specific to Mr. Huelsman, not the public at large.

F.3d 702, 710 (6th Cir. 2003).

Plaintiffs argue that Deputies Gregory and Walsh "acted with deliberate indifference because they [] knew [Mr. Huelsman] was in a mental health crisis from which they could infer he was at risk of suicide." (Doc. 66 at 30).

Yet the undisputed facts show that—although they arguably could have drawn the influence that Mr. Huelsman was suicidal—Deputies Gregory and Walsh did not draw the inference that Mr. Huelsman was suicidal, and their conduct was not egregious.

The record makes clear that Deputies Gregory and Walsh were aware that they were responding to a mental health issue at the Huelsman residence. It is disputed whether the deputies were aware that they were being dispatched for a suicide related call when they arrived at the Huelsman residence,[11] but even assuming they were aware that the caller expressed concern that Mr. Huelsman may be considering suicide, their conduct was neither egregious nor reckless.

When Deputy Gregory arrived at the Huelsman residence, Mrs. Huelsman was crying, and Mr. Huelsman was calm. Mrs. Huelsman told Deputy Gregory Mr. Huelsman was hearing voices, but Mr. Huelsman explained that he wasn't hearing voices and realized that the radio was on. Mrs. Huelsman told Deputy Gregory that Mr.

---

[11] Dispatch did not tell Deputy Gregory that it was a suicide call over the radio. (Doc. 50-12 at PAGEID# 1785–90). Yet the computer terminals in the deputies' vehicles contained a computer-aided dispatch ("CAD") report stating that they were responding to a call involving psychiatric, abnormal behavior and a suicide attempt. (Doc. 41-6 at PAGEID# 467–68). In his deposition, Deputy Gregory attested that he did not have time to review the CAD Report. (Doc. 50 at PAGEID# 1482).

Huelsman was paranoid because he believed she caused his phone to stop working, but Mr. Huelsman explained that his electronics were not working properly.  Mrs. Huelsman had never confirmed whether the electronics were working.  Based on these interactions, Deputy Gregory heeded the concerns expressed by Mrs. Huelsman, but it would not be obvious that Mr. Huelsman was suicidal.

Deputy Gregory then separated Mrs. and Mr. Huelsman.  Mrs. Huelsman expressed that she thought her husband needed to go to the hospital, but Deputy Gregory explained that he did not have probable cause to remove Mr. Huelsman from the residence and transport him to the hospital.  It was only then that Mrs. Huelsman expressed that she was afraid of her husband and afraid that he may be suicidal.  Yet, Mr. Huelsman heard this and explained that the only statement he made was that if he ever killed himself, she wouldn't be able to afford their house.  While this statement is cause for concern, it does not obviously demonstrate that Mr. Huelsman was suicidal.  *See Shaw*, 183 F.Supp.3d. at 882, 887 (finding that police officer was not deliberately indifferent even though individual who eventually committed suicide asked him "if people went to hell if they commit suicide.").

When Deputy Walsh arrived and spoke to Mrs. Huelsman, Deputy Walsh also concluded that there was not probable cause to transport Mr. Huelsman to the hospital against his will.  Therefore, Deputy Walsh and Gregory—who had both received extensive training on dealing with mentally ill and suicidal individuals (Doc. 48 at PAGEID# 1187; Doc. 50 at PAGEID# 1431)—determined that there was not probable

cause to place Mr. Huelsman into custody as a suicide risk. Notably, Deputy Gregory had responded to calls and then transported individuals to a hospital for a mental health evaluation and/or 72 hour hold 61 times between February 29, 2008 and February 15, 2018. (Doc. 60-1 at ¶ 60). Therefore, while there had been incidences where the deputies actually inferred a risk of suicide, this incident was not one of those times.

Nevertheless, even though the deputies did not believe that Mr. Huelsman was a suicide risk, they still decided to contact Mobile Crisis to help with the situation. This evidence shows that the deputies did not act with callous indifference, but were actually trying to resolve the situation and make sure harm did not come to either Mrs. or Mr. Huelsman.

Plaintiffs also contend that it is disputed whether Deputies Gregory and Walsh were aware that Mr. Huelsman had access to a gun during the incident. The evidence shows that the deputies had been aware that there were guns at the residence before arriving. However, it is undisputed that Mr. Huelsman told Deputy Gregory that Mrs. Huelsman had locked up all of the guns in the household and taken away the key, that Mrs. Huelsman heard Mr. Huelsman tell Deputy Gregory that the guns were not accessible and did not inform Deputy Gregory otherwise, and that Mrs. Huelsman told Deputy Gregory that she had hidden Mr. Huelsman's guns[12], and she never told either

---

[12] In his deposition, Deputy Gregory attested that Mrs. Huelsman "advised that she had hidden all the guns from him because she was worried about him." Plaintiffs counsel then asked, "[a]ll the guns?" To which Deputy Gregory responded "[h]idden – well, hidden his guns from him[.]". (Doc. 50-1 at PAGEID# 1513). Plaintiffs contend that this testimony shows that the deputies should have known that guns were accessible to Mr. Huelsman because Mrs. Huelsman said she

deputy that Mr. Huelsman may still have access to a gun.  (*See* Docs. 60-1 at ¶ 20, 68-1 at ¶ 20).  Thus, Deputies Gregory and Walsh had no reason to infer that Mr. Huelsman still had access to a gun, and they were therefore not deliberately indifferent to the risk of Mr. Huelsman shooting himself.

Plaintiffs have failed to raise a genuine issue of material fact to show that Deputies Gregory and Walsh acted with deliberate indifference to Mr. Huelsman's risk of suicide.  Ultimately, the Court cannot find that this is one of the rare cases where the state-created danger exception applies to a situation where an individual commits suicide because Deputies Gregory or Walsh did not increase the risk that Mr. Huelsman would commit suicide, nor did they act with deliberate indifference.

### b.  No clearly established constitutional right was violated

Although the Court need not address the second prong of the qualified immunity test, it is worth noting that, even if the Court had found that Deputies Gregory and Walsh violated Mr. Huelsman's constitutional rights, they still would be entitled to qualified immunity because any constitutional violation was not clearly established.  A law is clearly established if "a reasonable official would understand that what he is doing violates that right."  *Creighton*, 483 U.S. at 640.  As discussed, the Sixth Circuit "has never found liability under the state-created-danger doctrine where the victim committed suicide."  *Cutlip*, 488 F. App'x at 115; *Jahn*, 617 F. App'x at 463.  The Court cannot find

---

had "hidden his guns from him," but she didn't say she "hidden all of his guns from him."  (*See* Doc. 66 at 34).  The Court is unimpressed and unpersuaded by Plaintiffs' rhetorical argument.

that a reasonable police officer would understand the actions of Deputies Gregory and Walsh to be unconstitutional, especially in light of *Cutlip* and *Jahn*. Therefore, it is clear here that Deputies Gregory's and Walsh's actions on the day of Mr. Huelsman's suicide did not violate a clearly established constitutional right.

Plaintiffs have not met their burden of showing that Deputies Gregory and Walsh are not entitled to qualified immunity. *See Untalan*, 430 F.3d at 314. Although the wisdom of qualified immunity has come into question in recent months, this is clearly a case where qualified immunity is necessary and proper. Even if their actions show some mistaken judgment, it is clear that Deputies Gregory and Walsh were not plainly incompetent, and they did not knowingly violate the law. *See Hunter*, 502 U.S. at 229. Accordingly, Defendants motion for summary judgment on Plaintiffs' § 1983 claim against Deputies Gregory and Walsh is well-taken.

### 2. County Defendants are not liable under § 1983

Plaintiffs also bring a §1983 claim against the County Defendants for "ratifying Deputy Gregory's and Deputy Walsh's unconstitutional actions." (Doc. 66 at 41). Plaintiffs concede that "if Defendants Gregory and Walsh did not violate Jack Huelsman's due process rights, the County [Defendants] cannot be liable for ratifying the officers' actions." (*Id.*). Here, the Court has found that Deputies Gregory and Walsh did not violate Mr. Huelsman's constitutional rights, and, therefore Plaintiffs claims against County Defendants fail as a matter of law. Accordingly, Defendants' motion for summary judgment on Plaintiffs' § 1983 claim against County Defendants is well-taken.

26

### 3.  Defendants Did Not Violate the ADA

Plaintiffs allege that "Defendants intentionally discriminated against Mr. Huelsman or failed to provide him a reasonable accommodation when they prevented him from being protected from acting on his suicidal ideations in violations of Title II of the Americans with Disabilities Act."  (Doc. 1 at ¶¶ 55–58).  Specifically, Plaintiffs claim that Mr. Huelsman was denied a reasonable accommodation when Deputy Gregory called off the EMS unit.  (Doc. 66 at 49).[13]

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The Sixth Circuit has concluded that "the phrase 'services, programs, or activities' encompasses virtually everything a public entity does."  *Tucker v. Tennessee*, 539 F.3d 526, 532 (6th Cir. 2008) (quoting *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998)).  A plaintiff may prove discrimination by either showing intentional discrimination or failure to make reasonable accommodation.  *McPherson v. MHSAA*, 119 F.3d 453, 460 (6th Cir. 1997).  Under the latter form of

---

[13] Plaintiffs appear to have abandoned their claim that Defendants intentionally discriminated against Mr. Huelsman.  (*See* Doc. 66 at 45–49).  If not, the claim clearly fails as a matter of law. In order to show intentional discrimination under the ADA, Plaintiffs "must present evidence that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive."  *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015) (citing *Turner v. City of Englewood*, 195 F. App'x 346, 353 (6th Cir. 2006).  Plaintiffs have shown no evidence to suggest that any Defendants' actions were taken with animus towards Mr. Huelsman for any disability he experienced.

discrimination, "Title II requires a public entity to make 'reasonable modifications' to its 'policies, practices, or procedures' when necessary to avoid such discrimination." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749 (2017) (quoting 28 C.F.R. § 35.130(b)(7) (2016)).  "[A] reasonable accommodation claim does not require proof of discriminatory intent." *Dayton Veterans Residences Ltd. P'ship v. Dayton Metro. Hous. Auth.*, No. 3:16-CV-466, 2019 WL 1331311, at *19 (S.D. Ohio Mar. 25, 2019), *reconsideration overruled*, No. 3:16-CV-466, 2019 WL 5956543 (S.D. Ohio Nov. 13, 2019).

The Sixth Circuit has not specifically ruled on what constitutes a reasonable accommodation when police officers are responding to 911 calls, and other circuits are split on what qualifies as a reasonable accommodation in similar circumstances.  The Fifth Circuit has held that "Title II does not apply to an officer's on-the-street responses to reported disturbances or similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000).  The Fourth Circuit has concluded that exigent circumstances bear on what is reasonable under the ADA, but assumes "that a duty of reasonable accommodation exist[s]." *Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171, 175 (4th Cir. 2009).

This Court finds that the proper approach for determining whether police officers failed to provide a reasonable accommodation when responding to a 911 call was articulated by the district court in *Moore v. City of Berkeley*, No. 14-CV-00669-CRB, 2018 WL 1456628 (N.D. Cal. Mar. 23, 2018), *aff'd*, 801 F. App'x 480 (9th Cir. 2020).  In

*Moore*, the court found "[i]n order to raise a triable issue of fact whether officers failed to provide a reasonable accommodation in the context of an arrest, a plaintiff must make two showings[.]" *Id.* at *5. First, the plaintiff must produce evidence that a reasonable accommodation existed that would have helped the disabled individual, that the accommodation was feasible, that in the situation the officer knew or should have known of the accommodation, and that the benefit of providing the accommodation outweighed the burdens of doing so. *Id.* (referencing *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002)). "Second, the Plaintiff must establish that there is a basis in the record from which a reasonable juror could conclude that the officers failed to offer an equivalent accommodation." *Id.* "An officer does not fail to reasonably accommodate when he selects one of two equally attractive options." *Id.* (citing *Waller*, 556 F.3d at 175–76; *Van Gorder v. Grand Trunk W. R.R.*, 509 F.3d 265, 270–71 (6th Cir. 2007)). This is because, "[o]therwise, plaintiffs would be able to withstand summary judgment, because 'there is always something more or different that could have been done.'" *Id.* (quoting *Waller*, 556 F.3d at 176).

Plaintiffs have failed to make a showing that there is a triable issue of fact on either of the two prongs of the reasonable accommodation test.

Plaintiffs claim that having the EMS unit assess Mr. Huelsman was a reasonable accommodation "because EMS was ready to assess his mental health status and provide medical treatment or recommend hospitalization for Mr. Huelsman as necessary." (Doc. 66 at 49). Yet, the evidence does not demonstrate that EMS was prepared to provide any

accommodation to assist Mr. Huelsman that Deputies Gregory and Walsh were not able to provide.

Plaintiffs assert that the EMS unit was trained to and could have assessed Mr. Huelsman's mental status and asked specific questions related to Mr. Huelsman's suicide threat level.  (Doc. 66 at 8).  In order to support this argument, Plaintiffs reference the deposition testimony of Scott Arthur, one of the EMS technicians at the Huelsman residence.  Arthur stated, "[w]e can assess someone's mental status, we can assess their physical attributes, we can make a recommendation[.]"  (Doc. 42 at PAGEID# 551).  Arthur stated that he is able to assess mental health "[t]o the extent they won't answer questions appropriately."  (*Id.*).  When asked what types of questions he asks to assess mental state, he stated:

> The first four questions are always their name or do they know who they are; do they know where they are; do they understand the time, the day, date; and do they understand what's going on around them . . . If they express that they are suicidal, we would ask them if they had any plan to hurt themselves.

(*Id.*).  Arthur later clarified the EMS's ability to provide mental health assessment, stating "I mean, we're not mental health professionals; we're EMTs and paramedics.  All we can do is [ ] ask them questions.  Patients frequently deceive us . . . it's very limited in scope, the training we receive."  (*Id.* at 553).  Additionally, the other EMS technician at the scene specifically stated that he had not been trained to evaluate individuals for psychiatric or mental health conditions.  (Doc. 45 at PAGE# 711).

This deposition testimony evinces that the EMS technicians did not in fact have

significant training in how to deal with mental health crises or suicidal individuals.  At the same time, Plaintiffs themselves recognize that "both Deputies Gregory and Walsh were trained and experienced in dealing with mentally ill and suicidal individuals." (Doc. 66 at 31).  Plaintiffs also emphasize that Deputy Gregory had "extensive training, having completed a 40-hour Crisis Intervention course, focused on mental health crises, including bipolar disorder and suicide risk."  (*Id.*).  The record—and Plaintiffs' own brief—reflects that the deputies had more training and experience dealing with mentally ill and suicidal individuals than the EMS technicians.

Plaintiffs have failed to provide any evidence demonstrating that the EMS unit would  have been able to provide an accommodation that would have helped Mr. Huelsman that the deputies were unable to provide.  Therefore, Plaintiffs have failed to meet the first prong of the reasonable accommodation test.

Even if the Court found that Plaintiffs had shown that the EMS technicians were able to provide an accommodation that would have helped Mr. Huelsman, Plaintiffs also fail to make a showing under the second prong of the reasonable accommodation test. Here, a reasonable juror could not conclude that the officers failed to offer an equivalent accommodation.  As mentioned, Deputies Gregory and Walsh were trained to provide the exact accommodation that Plaintiffs claim the EMS unit could have offered.  Moreover, Deputy Gregory called Mobile Crisis to the scene to evaluate Mr. Huelsman.  Mobile Crisis is specifically trained and experienced in dealing with mentally ill and suicidal individuals.  Thus, Deputy Gregory chose to call mental health professionals to evaluate

Mr. Huelsman instead of EMS technicians without significant training on how to deal with mental health crises.  Deputy Gregory did not just choose an equally attractive option by calling Mobile Crisis to evaluate Mr. Huelsman instead of the EMS unit, he arguably chose a more attractive option.  Unfortunately, Mr. Huelsman committed suicide before Mobile Crisis arrived, but he was not denied a reasonable accommodation.

Therefore, because Plaintiff has not established that there is a basis in the record from which a reasonable juror could conclude that Defendants failed to offer a reasonable accommodation, Plaintiffs' ADA claim fails as a matter of law.  Accordingly, Defendants' motion for summary judgment on Plaintiffs' ADA claim is well-taken.

### 4. Deputies Gregory and Walsh are entitled to statutory immunity for state law claims

Finally, Defendants move to dismiss Plaintiffs' state law claims against Deputies Gregory and Walsh.  Defendants contend that Deputies Gregory and Walsh are entitled to immunity under R.C. § 2744.03(A)(6).  Plaintiffs argue that Deputies Gregory and Walsh are not entitled to statutory immunity because their "acts or omissions [were done] with malicious purpose, in bad faith, or in a wonton or reckless manner."  O.R.C. § 27444.03(A)(6)(b).

Under Ohio law, "reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct."  *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E. 2d 266, 273-74.

Recklessness can be defined as a "perverse disregard of a known risk."

> *Myrick v. City of Cincinnati*, No. C-080119, 2008 Ohio App. LEXIS 5730, at ¶ 18 (Ohio App. Dec. 26, 2008). This includes a failure to act in "contravention of a duty" when the actor knows, or has reason to know, facts that "would lead a reasonable person to realize such conduct creates an unreasonable risk of harm substantially greater than the risk necessary to make the conduct negligent." *Fowler v. Williams County Comm'rs*, 682 N.E.2d 20, 27 (Ohio 1996).

*McCullum v. Tepe*, No. 1:08-CV-387, 2011 WL 13186318, at *12 (S.D. Ohio March 28, 2011).

The Sixth Circuit has found that, where a reasonable juror could not find that officers acted with deliberate indifference, "there is insufficient evidence to find that they acted with malicious purpose, in bad faith, or in a wanton or reckless manner." *Ruiz-Bueno v. Scott*, 639 F. App'x 354, 365 (6th Cir. 2016); *see also Farmer v. Brennan,* 511 U.S. 825, 836 ("It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."); *Stefan v. Olson,* 497 Fed. App'x 568, 580–81 (6th Cir. 2012) (noting similarities between the "deliberate indifference" standard and Ohio's "wanton or reckless manner" standard).

As discussed *supra*, even with all facts and inferenced construed in the light most favorable to Plaintiffs, a reasonable juror could not find that Deputies Gregory and Walsh acted with deliberate indifference. For the same reasons, Plaintiffs cannot show that Deputies Gregory or Walsh acted in a wanton or reckless manner. Thus, Deputies Gregory and Walsh are entitled to statutory immunity under R.C. § 2744.03(A)(6). Accordingly, Defendants' motion for summary judgment on Plaintiffs' state law claims is

well-taken.

## IV.    CONCLUSION

Accordingly, for the reasons outlined above:

    1) Plaintiffs' motion for leave to file sur-reply (Doc. 70) is **GRANTED**.

    2) Defendant's motion for summary judgment (Doc. 60) is **GRANTED**.

    3) The Clerk shall enter judgment accordingly, whereupon this case is **TERMINATED** from the docket of this Court.

**IT IS SO ORDERED.**

Date:  9/30/2020                                   */s/ Timothy S. Black*
                                                  Timothy S. Black
                                                  United States District Judge